**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MAY WU, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:13-692 |
| | § | |
| CAROLYN COLVIN, ACTING | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

In this Social Security case, Plaintiff May Wu has filed a Motion for Summary

Judgment [Doc. # 8], and the Commissioner has filed a Response Brief [Doc. # 14]

seeking dismissal of the case, which the Court construes as a motion for summary

judgment.  The motions now are ripe for decision.  Having considered the parties'

briefing, the applicable legal authorities, and all matters of record, the Court concludes

that Defendant's motion should be **denied**, Plaintiff's motion should be **granted**, and

that this case should be **remanded** to the Commissioner.

## I.     BACKGROUND

### A.     Procedural Background

Plaintiff May Wu filed an application with the Social Security Administration

("SSA") on June 30, 2010, seeking supplemental security income ("SSI") benefits under Title XVI and disability benefits under Title II.  She alleges onset of disability on January 31, 2008.  After being denied benefits initially and on reconsideration, Wu timely requested an administrative hearing before an Administrative Law Judge ("ALJ") to review the denial.

On April 11, 2011, Plaintiff appeared before ALJ Susan J. Soddy for an administrative hearing.  After Plaintiff presented a letter requesting an attorney, the ALJ postponed the hearing without hearing any testimony.  R. 27-30.  On May 4, 2011, Plaintiff appeared before ALJ Soddy for an administrative hearing, and was represented by attorney David Dopkin.  R. 31-68.  The ALJ heard testimony from Vocational Expert Karen E. Nielsen, and from Plaintiff's mother, Geping Fang.

On June 10, 2011, the ALJ denied Plaintiff's request for benefits.  R. 12-22. On January 19, 2013, the Appeals Council denied Plaintiff's request for review.  R. 1-6.  Plaintiff filed this case on March 11, 2013, seeking judicial review of the Commissioner's denial of her claim for benefits.  Complaint [Doc. # 1].

**B.**     **Factual Background**

Plaintiff May Wu was born in China on May 5, 1986.  Her family came to the United States when she was five years old.  In December 1996, at the age of ten, she was struck by a car while riding her bicycle.  She suffered a traumatic brain injury and

was admitted to the hospital in a coma.  R. 387-89.  She underwent a craniotomy to evacuate subdural and epidural hematomas.  R. 260.  As part of her rehabilitation, Wu had to relearn basic tasks such as brushing her teeth and, although she previously had been fully bilingual, Wu reverted to Chinese after the accident and had to relearn English.  R. 427.  Wu previously had been a strong student, but after returning to school was placed in special education.  R. 260, 427.  She graduated from high school in 2004 with low to average scores after completing a special education program.  R. 260, 390.[1]  Wu attempted multiple jobs in fast food and retail, including McDonalds, Jack in the Box, Panda Express, and Macy's.  However, Wu and her mother, Geping Fang, reported to medical providers that Wu could not keep up with her work and ultimately could not hold any of these jobs.  *See*, *e.g.*, R. 427-28.

Beginning in 2008, at the age of 22, Plaintiff was treated at the Department of Psychiatry and Behavioral Sciences at the University of Texas Medical Branch ("UTMB") in Galveston.  Plaintiff always was accompanied by her mother, who reported odd behaviors and continuing effect's of Wu's traumatic brain injury.  In July 2008, Fang reported abnormal behavior from Wu over the preceding year, such as ordering coffeemakers and posterboard that her mother said she did not need.  Fang

---

[1]    In 2007, before the alleged onset date for Plaintiff's benefits application in this case, Wu was treated at M.D. Anderson Cancer Center for a malignant ovarian tumor.  She underwent successful surgery and was monitored thereafter.  R. 327-47.  She does not claim eligibility for benefits based on this condition.

also reported that Wu was failing one of her courses at the College of the Mainland, and that Wu had gotten a job as a waitress despite Fang's instructions not to do so during school.  Wu denied problems at home or work and said she wanted the job for spending money.  The physician noted that Wu and Fang "disagree[d] on what the patient's role is" and that they had agreed to contact a family therapist.  R. 307-09.[2]

On August 6, 2009, Wu returned to the Psychiatry and Behavioral Sciences Department at UTMB.  Her Global Assessment of Functioning ("GAF") score was assessed as 60.  Fang, who provided most of the information during the appointment, stated that Wu had not been her usual self for the past fifteen months, and that family members observed Wu smiling and laughing to herself and making strange faces.  Fang was concerned that her daughter was regressing.  She reported that two of Wu's paternal aunts had mental illness, and that one had committed suicide; she also reported that Wu's paternal great-grandfather had committed suicide.  The physicians noted that Wu's behavior was not age appropriate and that she was overly dependent on her mother.  R. 293-96.

At a follow-up appointment at the Psychiatry and Behavioral Sciences Department on August 20, Fang continued to report odd behaviors by Wu, including shopping for unnecessary items, troubles with concentration, inappropriate smiling or

---

[2]    Wu and Fang had at least two appointments with a therapist in August 2008.  R. 298-306.

laughing, and social isolation.  The physicians noted that Wu was cooperative but that her affect was inappropriate for the situation, that she repeatedly touched her face with the back of her hand, and that a journal they had asked her to keep was simplistic and juvenile for a 23 year old.  R. 281 (journal was "incomplete with inclusion of limited, random information").  They noted that Wu was "clearly displaying some oddities in her behavior that were not previously present that are very concerning to her family," and that she "has had an obvious regression in her functioning and the emergence of more childlike attitude and behaviors in recent years."  R. 283.  They further noted her strong family history of mental illness.  Dr. Cindy Wigg stated that Wu was difficult to assess because she did not endorse her mother's concerns and downplayed her symptoms, and that Fang's culture and language differences made the assessment even more challenging.  She started Wu on a low dose of Risperdal, an antipsychotic medication.  R. 283.

In September 2009, at follow-up appointments at the Psychiatry and Behavioral Sciences Department, Fang reported that Wu had improved on the medication, although Fang had adjusted the dosage when Wu seemed overly sedated.  Medical providers continued to assess Wu's attitude as "age inappropriate."  Fang reported that Wu's functioning was increased because she was able to get more done and, although still distracted, was easier to redirect.  She also reported that Wu's odd inappropriate

laughter had ceased and her thinking and conversations were more ordered.  Wu had signed up for pharmacy technician classes at Galveston Community College.  R. 287-91.

In October 2009, Wu reported at the Psychiatry and Behavioral Sciences Department that she was doing "quite well," and Fang agreed.  Wu had made a friend at school with whom she studied, and had recently made 89 and 91 on school tests.  Although Fang was concerned about Wu's concentration, Wu stated that she could concentrate.  Her GAF was assessed as 70.  Medical providers continued to note her attitude as "age inappropriate" and childlike, and her overdependence on her mother.  Wu continued on Risperdal.  R. 284-85.  In November, 2009, Fang and Wu continued to report that she was doing well and making all As in pharmacy technician school.  Her GAF was assessed as 80.  She was contined on Risperdal.  R. 273-74.  In January 2010, her GAF was assessed as 70.  Wu reported that she had one semester of pharmacy technician school to go and was making 3 Bs and an A.  The physicians again noted Wu's "age inappropriate, childlike" attitude, her "slightly blunted" affect, and soft speech.  Wu's dose of Risperdal was increased.  R. 270-72.

In May 2010, Wu again was seen at UTMB's Psychiatry and Behavioral Sciences Department.  Her GAF score was assessed as 80, and Wu reported that she was doing well.  She expected to graduate from the pharmacy technician program in

one week, and stated that she was looking for a job.  She was continued on Risperdal. R. 267-69.

On May 26, 2010, Wu was seen by Jennifer R. Raley, M.D., in UTMB's Department of Family Medicine.  Wu and Fang stated that Wu was applying for special accommodations at college but that the school required "a doctor's diagnosis of her situation."  R. 263.  Dr. Raley conducted a Mini-Mental State Exam and diagnosed Wu with short-term memory loss.  She referred Wu for neuropsychological testing the next day.  R. 262-65.

On May 27, 2010, Wu received a neuropsychology evaluation from Vicki M. Soukup, Ph.D., of UTMB's Department of Neurology.   R. 259-61.  Dr. Soukup reviewed Wu's medical history, including her traumatic brain injury at age ten and her subsequent rehabilitation and academic career.  In addition to conducting a clinical interview, Dr. Soukup administered a battery of tests.[3]  She assessed Wu's arithmetic skills and single word reading ability at post-high school levels, and various other skills as within normal limits.  However, she identified severe deficits in Wu's ability to learn new verbal information (second percentile), retrieval of information after a twenty-minute delay (zero percentile), and recognition memory (zero percentile).  R.

---

[3]     Dr. Soukup's records identify the tests as follows:  "TOTO, WRAT-III Rd/Arith, BNT, ROCF, HVLT-R (5), Verbal Fluency, Trails, Dsy/SySr."  R. 260.

260-61.  Her impression was recorded as follows:

> [Wu's] test results are consistent with a history of head trauma, with deficits in temporal functions (visual/verbal memory) and frontal lobe functions involving verbal fluency.  Although she has made impressive gains in her recovery she continues to exhibit the expected problems in memory and defective verbal fluency.  Her diagnosis is traumatic brain injury secondary to bike/[motor vehicle accident]—this is a permanent disabling condition, resulting in significant limitations in her ability to retrieve newly learned information.

R. 261.  She stated that Wu's memory deficits present "considerable problems in her attempts to complete an academic curriculum," but noted that Wu could by assisted by accommodations including "tape recorders, repetition, use of tutors, more one-on-one time with instructors, extended time for testing, [and] 'hands on experiences' as opposed to sole reliance on textbooks."  R. 261.  She further recommended "discussion of whether this career choice [of Pharmacy Technician] is a realistic goal."  R. 261.

After her assessment by Dr. Soukup, Wu continued treatment at UTMB's Neurology Department.  The records before this Court include records from Rodrigo O. Kuljis, M.D., from August through November of 2010.  R. 366-86.  On August 5, 2010, Dr. Kuljis reviewed Dr. Soukup's neuropsychological testing and developed a plan to "obtain tests to ascertain brain function and contributors to impaired brain function, in order to establish the precise potential for vocational counseling."  R. 370-

71.  He started Wu on rivastigmine "based on published evidence that it improves cognition in seemingly stabilized posttraumatic cognitive impairment."  R. 371.[4]

On November 2, 2010, Wu returned for a follow up visit with Dr. Kuljis in Neurology.  Wu and Fang reported that Wu now was pursuing a degree in education, and stated Wu was doing "much better" in college.  However, Dr. Kuljis noted that, based on the neuropsychological evaluation by Dr. Soukup revealing Wu's cognitive deficits, vocational counseling now was focused on "downgrading her expectation from being a teacher to a teacher's aide, which apparently her mother is accepting."  R. 367.  Wu had been unable to tolerate the prescribed rivastigmine, so Dr. Kuljis recommended a therapeutic trial of donepezil.  Dr. Kuljis recorded an impression of "posttraumatic head injury syndrome with major memory among other cognitive deficits," with possible benefits from cognitive rehabilitation.  He further stated, "Over half of this 45-minute evaluation was spent in explaining at increasingly lower levels of complexity the condition, the results of the various tests, and the recommendations for treatment."  R. 367.

On  April  7,  2011,  Michael  M.  Stone,  MD,  completed  a  Mental  RFC

---

[4]   An MRI on August 10, 2010, showed "[e]xtensive post traumatic gliosis in the brain, most prominent in the gyrus recti and right parietal occipital lobes" and "irregularity of the odontoid."  R. 376.  An EEG (electroencephalogram) on August 24, 2010 was "abnormal because of the presence of focal slowing over the right frontotemporal area in wake, drowsiness and sleep."  R. 385.

Questionnaire and a "Medical Source Statement of Ability to Do Work-Related Activities" for Wu.  R. 419-25.  His completed forms state that he had treated Wu since August 2010 and that "other psychiatrists at UTMB" had treated her since July 2008.  R.421.[5]  On a form with checkboxes, Dr. Stone indicated that Wu had "extreme" limitations in understanding, remembering, and carrying out detailed instructions; "marked" limitations in understanding and remembering short, simple instructions; and "moderate" limitations in carrying out short, simple instructions and in making judgments on simple work-related decisions.  As support for his opinion, he referred to Dr. Soukup's testing showing "severe visual/verbal memory deficits, shown by testing at 2nd percentile or lower."  R. 419.  He further noted "marked" limitations in responding appropriately to changes in a routine work setting, stating that "changes in routine would require new learning but with patient's poor memory this would be impaired."  R. 420.

On the Mental RFC Questionnaire, Dr. Stone stated that Wu had a "very limited response to medication for her cognitive deficits" and was "unable to tolerate medication."  R. 421.  He referred to Dr. Soukup's clinical findings as support for the severity of Wu's impairment.  He assessed her prognosis as "guarded," stating that

---

[5]     Although Dr. Stone's completed forms state that he had treated Wu since August 5, 2010, R. 421, the record before this Court contains no other records from Dr. Stone.

Wu had "permanent cognitive deficits and mood changes."  R. 421.  On a checklist, he selected "no useful ability to function" when asked about Wu's ability to remember work-like procedures.  He further indicated that she was "unable to meet competitive standards" in understanding and remembering very short and simple instructions, carrying out very short and simple instructions, sustaining and ordinary routine without special supervision, and performing at a consistent pace without an unreasonable number and length of rest periods.  He assessed Wu as "seriously limited" in completing a normal workday and workweek without interruptions from psychologically based symptoms, responding appropriately to changes in a routine work setting, and dealing with normal work stress.  R. 423.  He explained that Wu's "significant impairments in verbal and visual memory [make] it extremely difficult for [Wu] to remember instructions, etc.  She has great difficulty in learning new material, so would be unable to train for a job in a reasonable period of time."  R. 423.  He referred to testing results showing her ability to learn new verbal information "is at the 2nd percentile" and her ability to remember verbal information is "at [the] lowest (0) percentile."  R. 424.   He stated that Wu did not have low IQ or reduced intellectual functioning, but did "have significant cognitive problems in area[s] of memory and learning."  R. 424.  He further stated that Wu was not a malingerer.  R. 425.

On April 15, 2011, Wu was seen by Vera A. Gonzales, Ph.D., a licensed psychologist, for a psychological evaluation.  R. 426-32.  Wu was accompanied by Fang, who was the primary informant for the interview.  Dr. Gonzales reviewed Wu's school records and the records from Dr. Soukup, and administered multiple tests.  Dr. Gonzales noted that Wu appeared "younger than her stated age" and that Wu's "cognitive difficulties" were "evident even in the waiting room" when Wu asked her mother why they were there.  R. 427.  Wu was "disoriented" and often asked Dr. Gonzales to repeat information.[6]

Dr. Gonzales' report reviews in detail Wu's brain injury in 1996 and her subsequent diagnoses, treatment, therapy and rehabilitation, and school career.  She noted that Wu had reverted to Chinese, her first language, after the accident, and had to relearn English as well as basic daily tasks.  Dr. Gonzales also noted that Wu had tried to complete schooling for phlebotomy and pharmacy tech, but that she was unable to handle the stress or the work, and that Wu had made multiple unsuccessful attempts to hold a job in fast-food or retail.   Dr. Gonzales stated:

> It is quite clear to me that she will be unable to work in competitive employment.  She may be able to volunteer a couple of hours just to have something to do, but she should certainly not try to work in a fast food

---

[6]     Dr. Gonzales noted that Wu's eye contact was good, "but this is something I have seen before with people who have suffered a [traumatic brain injury].  It is wide-eyed because they know they are supposed to look at you and they are supposed to smile when they see you.  This is consistent with rehabilitation training received."  R. 427.

place.

R. 428.  She provided her "clinical opinion" that Wu "will not be able to have any residual memory gain or residual cognitive gain," in light of the fact that her injury was fourteen years prior and "the literature suggests that we are set in memory recovery and cognition at 18 to 24 months after a brain injury."  R. 428.

Dr. Gonzales was not able to administer the MMPI-2 to Wu "due to problems with concentration and staying on task."  R. 429.  She administered the Wechsler Adult Intelligence Scale–Third Edition ("WAIS-III"), which showed Wu's reasoning abilities in the "low average" range, at approximately the 12% percentile, but which did not indicate the possibility of a learning disorder.  R. 430.  Dr. Gonzales also administered the Wide Range Achievement Test-3 ("WRAT-3") and the Wechsler Memory Scale–III ("WMS-III"), among other tests.  The WMS-III resulted in several scores in the "extremely low" range, and demonstrated severe impairments in Wu's memory, in particular, her "difficulty holding information in temporary storage" and a "rapid loss of relevant information required to accurately perform mental operations at the level of her peers."  R. 431.  Wu also had "significant difficulty" in remembering new information and in retrieving recently learned information after a twenty-five minute delay, leading to functional difficulties in daily living or employment.  R. 431.

Dr. Gonzales concluded that Wu's symptoms were consistent with a "traumatic brain injury resulting in Amnestic Disorder":

> Although the client has pushed herself to try to go to school and to work, she has not been successful at either. . .  The claimant at times has no awareness of her deficits and has to be reminded.  It appears that she has received no "real" cognitive therapy and could make use of compensatory strategies.  The claimant has symptoms consistent with mood disorder, mild to moderate depression, mil[d] to moderate anxiety, and memory and cognition difficulties . . . . Prognosis is considered guarded.  The claimant may benefits from a cognitive memory rehabilitation clinic to learn compensatory strategies [and] would benefit from seeing a psychologist that specializes in people with [traumatic brain injury]/trauma.  The literature supports Dr. Soukup and my evaluation, claimants with [traumatic brain injury] with an injury date of over 14 years will not gain any in cognitive or memory status.  It is my clinical opinion that this claimant's disability will last a lifetime and she will need me[d]ical and mental health care.  She will always run the risk of having safety concerns because she has no real compensatory strategies and can put herself in dangerous situations (i.e., leaving stove on, trusting anyone, etc.).

R. 432.  As to Wu's capabilities, Dr. Gonzales stated, "The claimant is not able to enter into competitive employment (full-time or part-time) in any field at this time. It is my clinical opinion that Ms. Wu's disability will last a lifetime."  R. 432.

## II.    **SUMMARY JUDGMENT STANDARD**

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the

party's case, and on which that party will bear the burden at trial.[7]  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8]  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[9]

## III.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to two inquiries: first, whether the final decision is supported by substantial evidence on the record as a whole, and second, whether the Commissioner applied the proper legal standards to evaluate the evidence.[10]  "Substantial evidence" is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[11]  It is more than

---

[7]     *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).

[8]     FED. R. CIV. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

[9]     *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

[10]    *See Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

[11]    *Audler*, 501 F.3d at 447 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

a mere scintilla and less than a preponderance.[12]

When applying the substantial evidence standard on review, the court scrutinizes the record to determine whether such evidence is present.[13] In determining whether substantial evidence of disability exists, the court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.[14] If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[15] Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.[16] The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.[17] In short, conflicts in the evidence are for the Commissioner, not the courts, to resolve.[18]

---

[12]    *Id.*; *Perez*, 415 F.3d at 461; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

[13]    *Perez*, 415 F.3d at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

[14]    *Perez*, 415 F.3d at 462 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)).

[15]    *Id.* at 461 (citing *Richardson*, 402 U.S. at 390); *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).

[16]    *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

[17]    *Audler*, 501 F.3d at 447; *Masterson*, 309 F.3d at 272.

[18]    *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272.

## IV.   ANALYSIS

### A.   Statutory Basis for Benefits

Wu applied for both Social Security disability insurance and Supplemental Security Income (SSI) benefits.  Social Security disability insurance benefits are authorized by Title II of the Social Security Act.  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured[19] *and* disabled,[20] regardless of indigence.

SSI benefits are authorized by Title XVI of the Social Security Act, and provides an additional resource to the aged, blind and disabled to assure that their income does not fall below the poverty line.[21]  Eligibility for SSI is based on proof of disability[22] and indigence.[23]  A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which he applies for benefits, no matter how long he has actually been disabled.[24]  Thus, the month following an application fixes the earliest date from which SSI benefits can be paid.

---

[19]     42 U.S.C. § 423(c) (definition of insured status).

[20]     42 U.S.C. § 423(d) (definition of disability).

[21]     20 C.F.R. § 416.110.

[22]     42 U.S.C. § 1382c(a)(3) (definition of disability).

[23]     42 U.S.C. § 1382(a) (financial requirements).

[24]     *Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); 20 C.F.R. § 416.335.

Eligibility for SSI, however, is not dependent on insured status.

Although these are separate and distinct programs, applicants to both programs must prove "disability" under the Act, which defines disability in virtually identical language. Under both provisions, "disability" is defined as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[25] The law and regulations governing the determination of disability are the same for both programs.[26]

### B.     **Determination of Disability**

When determining whether a claimant is disabled, an ALJ must engage in a five-step sequential inquiry, as follows: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment in Appendix 1 of the regulations; (4) whether the claimant is capable of performing past relevant work; and (5) whether the claimant is capable of performing any other work.[27] The

---

[25]     42 U.S.C. § 423(d)(1)(A) (disability insurance); 42 U.S.C. § 1382c(3)(A) (SSI).

[26]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

[27]     *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453.  The Commissioner's analysis at steps four and five is based on the assessment of the claimant's residual functional
                                                                        (continued...)

claimant has the burden to prove disability under the first four steps.[28]  If the claimant successfully carries this burden, the burden shifts to the Commissioner at Step Five to show that the claimant is capable of performing other substantial gainful employment that is available in the national economy.[29]  Once the Commissioner makes this showing, the burden shifts back to the claimant to rebut the finding.[30]  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.[31]

In this case, at Step One, the ALJ determined that Wu had not engaged in substantial gainful activity since January 31, 2008, her alleged onset date.  The ALJ found at Step Two that Wu had two severe impairments: (1) organic brain disorder and (2) mood disorder.  At Step Three, the ALJ concluded that Wu's impairments did not meet or medically equal a listed impairment in the relevant federal regulations.

Before proceeding to Step Four, the ALJ assessed Wu's residual functional

---

[27]     (...continued)
capacity ("RFC"), or the work a claimant still can do despite his or her physical and mental limitations.  *Perez*, 415 F.3d at 461-62.  The Commissioner assesses the RFC before proceeding from Step Three to Step Four.  *Id.*

[28]     *Perez*, 415 F.3d at 461; *Myers*, 238 F.3d at 619.

[29]     *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.

[30]     *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453.

[31]     *Perez*, 415 F.3d at 461 (citing 20 C.F.R. § 404.1520(a)).

capacity ("RFC") and found that she had no exertional limitations, but that her capacity was "limited nonexertionally due to her psychologically based symptoms."

R. 16.  In particular, she found:

> [C]laimant should avoid complex and detailed tasks and instructions as found in skilled and semi-skilled work, but can understand, remember and carry out simple tasks and instructions.  The claimant should have limited contact with the public and cannot work at fast-paced production jobs.

R. 16-17.  At Step Four, the ALJ determined that Wu was not able to perform her past relevant work as a fast food worker.  At Step Five, she determined that jobs existed in the national economy that Wu could perform, and therefore concluded that Wu was not under a disability during the relevant period.

### D.   Plaintiff's Arguments for Reversal

In this case, Wu presented opinions from a treating physician (Dr. Stone) and two examining physicians (Dr. Gonzales and Dr. Soukup), among other medical opinions.  Wu argues that the ALJ erred by improperly rejecting the medical opinions of her treating and examining physicians.  She further argues that the RFC crafted by the ALJ, which included a determination that Wu could "understand, remember and carry out simple tasks and instructions" is not supported by the medical evidence of record.

The ALJ is legally required to evaluate every medical opinions she receives,

and to consider certain factors when deciding how much weight to give the medical opinion.  20 C.F.R. §404.1527(c) (disability); 20 C.F.R. § 416.927(c) (SSI). Clear Fifth Circuit precedent requires an ALJ to give "controlling weight" to a treating physician's opinion, if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent" with other substantial evidence in the record.  *Newton*, 209 F.3d at 455 (internal quotation marks and citations omitted).[32]  The medical opinions of physicians who examine the claimant, even if they do not have a treating relationship with the claimant, also are entitled to additional weight.  *See* 20 C.F.R. § 404.1527(c)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."); 20 C.F.R. § 416.972(c)(1) (same).  A specialist's opinion is afforded greater weight than a generalist's opinion.[33]

An ALJ may discount the weight given to a treating physician's opinion for "good cause" when the treating physician's statements are brief and conclusory, are not supported by medically acceptable clinical, laboratory, or diagnostic techniques,

---

[32]    *See* 20 C.F.R. § 404.1527(c); 20 C.F.R. § 416.927(c); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Giles v. Astrue*, 433 F. App'x 241, 246 (5th Cir. 2011); *Beasley v. Barnhart*, 191 F. App'x 331, 334 (5th Cir. 2006).

[33]    *Newton*, 209 F.3d at 455.  *See* 20 C.F.R. § 404.1527(c)(5); 20 C.F.R. § 416.927(c)(5).

or are otherwise unsupported by the evidence.[34]  Before discounting the weight of a treating physician's opinion, an ALJ is required by regulation to consider the following factors: the physician's length of treatment of the claimant; the physician's frequency of examination; the nature and extent of the treatment relationship, the support of the physician's opinion afforded by the medical evidence of record; the consistency of the opinion with the medical record, and the physician's specialization.[35]  Even when an ALJ finds "good cause" to decline to give controlling weight to the treating physician's opinion, he or she must still address the required factors, and may not simply reject the opinion outright.[36]

A treating physician's opinion is not conclusive, and the decision regarding the claimant's status rests with the ALJ.  *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir.

---

[34]   *Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456.  *See Beasley*, 191 F. App'x at 334 ("The ALJ must always give good reasons for the weight it affords the opinion [of a treating physician], and must show good cause when giving that opinion little or no weight") (internal quotation marks, alteration, and citations omitted).

[35]   *Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; 20 C.F.R. § 404.1527(c); 20 C.F.R. § 416.927(c).

[36]   *Newton*, 209 F.3d at 456 ("'[A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. ***Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.***  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.'") (quoting SSR 96-2p) (emphasis added by *Newton*).

1994).   Moreover, because the determination of disability is reserved to the Commissioner, a medical source's conclusion that a claimant is "disabled" or "unable to work" is not binding on the Commissioner.  20 C.F.R. § 404.1527(d)(1); 20 C.F.R. 416.927(d)(1).  *See Thibodeaux v. Astrue*, 324 F. App'x 440, 444 (5th Cir. 2009).

In this case, Wu presented medical opinions from Dr. Stone, a psychiatrist who treated Wu, and from Drs. Soukup and Gonzales, both of whom examined Wu before rendering an opinion as to her condition and prognosis.   The ALJ largely rejected all three opinions by her finding, when determining Wu's RFC, that Wu "can understand, remember and carry out simple tasks and instructions."  R. 16-17.  This finding was contrary to the opinions of all three physicians.  For the reasons stated below, the ALJ's evaluation of these three medical opinions was inadequate under the above-cited Fifth Circuit authority and federal regulations**.**

First, the ALJ summarily rejected the extensive report of Dr. Gonzales with the following determination:

> The opinion of Dr. Gonzales is given no probative weight as it is merely an opinion that the claimant cannot work.

R. 20.  The ALJ offered no further support for her dismissal of Dr. Gonzales' opinion. Although it is true that Dr. Gonzales stated her opinion that Wu was unable to enter into competitive employment, this statement was only a small part of her detailed seven-page report.  As the report reflects, Dr. Gonzales administered battery of test

and conducted an extensive interview that included a careful review of Wu's medical history.  In addition to her opinion that Wu would not be able to hold competitive employment, Dr. Gonzales also provided medical opinions within her specialization, including her clinical opinion that Wu will not be able to have any residual memory or cognitive gain, and her conclusion based on testing that Wu suffered from severe memory impairments, leading to functional difficulties in daily living or employment. R. 428, 431-32.  The ALJ failed even to discuss this medical opinion—which directly contradicted the RFC—before rejecting it.  Although Dr. Gonzales was not a treating physician, she examined Wu, which entitles her opinion to more weight than those of non-examining physicians.  20 C.F.R. § 404.1527(c), § 416.927(c).  Dr. Gonzales' medical specialization and the supportability of her opinions (in particular, the battery of tests she administered) further add to the weight of her opinion.  *Id.*[37]  The ALJ's failure to properly evaluate her opinion requires remand.  *See Newton*, 209 F.3d at 456.

Second, the ALJ failed even to evaluate the medical opinion rendered by Dr. Soukup after her neuropsychological examination of Wu.  Although the ALJ recited some of Dr. Soukup's findings when reviewing the evidence in Wu's case, *see* R. 18,

---

[37]     The Court further notes that Dr. Gonzales was aware that Wu was attending school and made repeated attempts to hold jobs, but that this information, upon which the ALJ relied, did not alter Dr. Gonzales' medical opinion.

she made no further mention of Dr. Soukup's opinion and gave no reason for her failure to give the opinion weight.  Importantly, the ALJ's RFC determination is contrary to Dr. Soukup's opinion, supported by testing, that Wu's ability to learn new verbal information was in the 2nd percentile, her ability to retrieve information after a twenty-minute delay was in the lowest percentile (0%), and that her recognition memory was in the lowest percentile (0%).  R. 260-61.  Given her specialization and the supportability of her opinion, as well as her personal examination of Wu, Dr. Soukup's opinion was entitled to significant weight under the federal regulations and case law.  No medical evidence of record contradicted the opinion.  The ALJ's failure to afford the opinion its proper weight, and/or to articulate her reasons for discounting the opinion, requires remand.  *See Newton*, 209 F.3d at 456.

Finally, the ALJ did not give proper weight to the opinion of Dr. Stone, Wu's treating physician.  The ALJ's finding in the RFC that Wu could remember and carry out short, simple instructions is directly contradictory to the opinion of Dr. Stone, who stated that Wu was "unable to meet competitive standards" in this area.  The ALJ's finding also conflicts with Dr. Stone's opinion that Wu had "no useful ability to function" in regard to her ability to remember work-like procedures, and his opinions regarding her serious limitations in completing a normal workday and training for a new job.  Dr. Stone's opinions were supported by Dr. Soukup's testing results

showing very severe deficits in Wu's short-term memory.  R. 424 (citing test results showing Wu at the 2nd percentile for learning new verbal information and the "lowest (0) percentile" for remembering verbal information).  The ALJ's justification for rejecting Stone, in its entirety, was as follows:

> Dr. Stone's opinion is not only inconsistent with other substantial evidence of the record, but it has internal inconsistencies.  He is opining Ms. Wu is totally unable to function in an occupational or school environment based on his narrative opinions of her abilities and then rates her a GAF of 65 contradicting his own narrative comments.  It is also noted that claimant is functioning in a school environment.

R. 20.  The ALJ's reason is not legally adequate "good cause" to disregard Dr. Stone's opinion.  First, to the extent the ALJ bases her disregard of Dr. Stone's opinion on Wu's GAF scores, this rationale is inadequate because a GAF score is not determinative of a claimant's ability to work.  *See Andrews v. Astrue*, 917 F. Supp. 2d 624, 638 (N.D. Tex. 2013) (citing, *inter alia*,  65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000); *Kennedy v. Astrue,* 247 F. App'x 761, 766 (6th Cir. 2007); *Wind v. Barnhart,* 133 F. App'x. 684, 692 n. 5 (11th Cir. 2005)).  Moreover, the other evidence identified by the ALJ—in particular, Wu's "functioning in a school environment"—is lay evidence, not medical evidence.  There was, in this case, no medical evidence controverting Dr. Stone's opinion.  The ALJ's reliance on this lay evidence, and her failure to perform the required detailed analysis under the federal regulations, requires remand.  *See Newton*, 209 F.3d at 456.

V.  **CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that Defendant's request for summary judgment in their Response

Brief [Doc. # 14] is **DENIED**.   It is further

**ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. # 8] is

**GRANTED**. This case is **REMANDED** to the Commissioner for further proceedings

in accordance with this opinion.

A separate Order of Remand will issue.

**SIGNED** at Houston, Texas, this **6**[th] day of **March, 2014.**

Nancy F. Atlas
United States District Judge